UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Robert Lee Gessell,

     Plaintiff,

   vs.          REPORT AND RECOMMENDATION

Jo Anne B. Barnhart,
Commissioner of Social
Security,

      Defendant.     Civ. No. 05-588 (JRT/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the

Commissioner's final decision which denied his application for Disability Insurance

Benefits ("DIB").  The matter is now before the Court upon the parties' cross-Motions

for Summary Judgment.  The Plaintiff has appeared by George H. Smith,  Esq., and

the Defendant has appeared by Lonnie F. Bryan, Assistant United States Attorney.

For reasons which follow, we recommend that the Plaintiff's Motion for Summary

Judgment be denied, and that the Defendant's Motion be granted.

II.  Procedural History

The Plaintiff applied  for DIB on January 13, 2003, at which time, he alleged that he had become disabled as of November 1, 2001.  [T. 56-58].  His claims were denied upon initial review, and upon reconsideration. [T. 35-38, 41-43].  The Plaintiff timely requested a Hearing before an Administrative Law Judge ("ALJ") and, on April 29, 2004, a Hearing was conducted, at which, the Plaintiff appeared personally, and by counsel.  [T. 228].  Thereafter, on August 11, 2004, the ALJ issued a decision which denied the Plaintiff's claim for benefits. [T. 17-26].  The Plaintiff requested an Administrative Review before the Appeals Council which, on January 28, 2005, declined to review the matter further. [T. 6-8].  Thus, the ALJ's determination became the final decision of the Commissioner.  Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §1481.

III.  Administrative Record

A.    Factual Background.  At the time of the ALJ's decision, the Plaintiff was forty-four (44) years old, and was a high school graduate. [T. 24, 231].  The Plaintiff alleges that he cannot work due to status-post fracture of his left ankle, and pain in his low back/tail bone, and thoracic spine. [T. 56-58, 67].

1.   <u>The Plaintiff's Physical Impairments</u>.  On August 22, 1997, the Plaintiff fell from an eight (8)-foot ladder and broke his left ankle.  An orthopedic surgeon performed surgery, and inserted screws in the ankle.  Owing to a lack of health insurance, the Plaintiff received little physical therapy, and experienced increasing problems with low back and leg pain.  [T. 143].

In October of 2000, the Plaintiff sought treatment at the Pain Relief & Diagnostic Clinic, and was diagnosed with a neck sprain/strain. [T. 131].  The Plaintiff attended several physical therapy sessions and reported general improvement.  However, he experienced increased pain after a hunting session in which he carried a firearm for prolonged periods of time.  [T. 130, 133].  He also reported that he experienced aggravated neck pain after a session of weight lifting.  [T. 131].

In January of 2002, the Plaintiff received treatment from Dr. Sarah Bolcer, a podiatrist, for reported pain in his right foot.  [T. 135].  X-rays of the Plaintiff's foot showed bipartite tibial sesamoid, as well as a small spur at the right Achilles insertion, but there were no signs of a fracture or significant degenerative joint disease in the right foot.  <u>Id.</u>  Dr. Bolcer prescribed several anti-inflammatory medications, and had custom molded shoe inserts made for the Plaintiff.  However, the Plaintiff failed to follow up with Dr. Bolcer over the course of the following year.  [T. 134].

In February of 2003, the Plaintiff visited the Noran Neurological Clinic complaining of low back and leg pain. [T. 143]. Dr. Francisco Gomez noted that the Plaintiff ambulated slowly, but without any abnormality, and could walk on his heels and toes, and hop on each foot. [T. 144]. Dr. Gomez's examination noted that the Plaintiff's back was supple, with full mobility and no spasm, but was accompanied by complaints of moderate pain with mild palpitation. The doctor also reported:

> Examination does not reveal a clear neurological etiology to [his complaints of pain]. He may have a chronic pain syndrome. He may have an underlying chronic pain syndrome. He may have an underlying polyneuropathy.
>
> *     *     *
>
> He will undergo further evaluation with MRI of the lumbosacral spine and EMG. In the meantime, he has been asked to proceed with a trial of salsalate as an anti-inflammatory medication and Nortriptyline as a chronic pain medication. He will also begin physical therapy.

Id.

The MRI revealed that the Plaintiff has degenerative disc disease of the lumbar spine a L4-5 and L5-S1 levels, and degenerative changes in the L5-S1 joints. [T. 141-42]. A subsequent nerve conduction/electromyography study showed no evidence for neuropathy, radiculopathy, or myopathy. [T. 139].

During February through March of 2003, the Plaintiff attended eight (8) physical therapy sessions. [T. 174-84]. The Plaintiff reported a 25% improvement in his lower back condition, but was discharged because he was unable to progress to his ultimate goal, due to pain in his heel. [T. 174]. On April 1, 2003, Dr. W. Edwin Gould examined the Plaintiff's heel, and noted that the back of the Plaintiff's right heel displayed tenderness, but was devoid of swelling or redness. [T. 170]. The Plaintiff reported continuing use of Salsalate and nortryptiline. Dr. Gould referred the Plaintiff to a podiatrist, and prescribed vicodin for pain.

In March and April of 2003, State Agency physicians reviewed the medical evidence which related to the Plaintiff's physical condition, and concluded that the Plaintiff could occasionally lift twenty (20) pounds, and frequently lift ten (10) pounds. [T. 146-53]. The State Agency physicians concluded that the Plaintiff could sit, stand, and/or walk, for about six (6) hours in an eight (8) hour work day. [T. 147]. In addition, the State Agency physicians opined that Plaintiff's push/pull operation of left foot controls was limited, and that he should be limited to only occasional climbing, stooping, kneeling, crouching, or crawling activities. [T. 147-48]

On June 30, 2003, the Plaintiff was seen by Dr. Randall Chadwick, Jr., for a consultation concerning his complaints of right knee pain.  [T. 168].  The Plaintiff reported that he was able to complete only three (3) construction jobs, which primarily consisted of siding work.  Id.

Dr. Chadwick noted that the Plaintiff had a "little bit of fluid in the bursa over the tibial tubercle and patellar tendon," but that it was "not particularly inflamed."  Id. The Plaintiff had full extension and full flexion, but "[t]here is definitely some crepitation with resisted knee extension."  Id.

Dr. Chadwick's impression provided, in part:

> My impression is he has global leg pain, and I am not sure that pathology in any one area is going to explain all of his problem.  The majority of his problem seems to be his knee and that is why he was sent to see us.  I am not convinced that we are going to find any significant interarticular pathology.  We just did a diagnostic scope.
>
> I am going to set him up for an MRI * * * [i]t is possible he has got a Baker's cyst that leaked, several weeks ago, giving him sort of a pseudophlebitis picture but right now his exam seems fine.

[T. 168].

The subsequent MRI revealed mild chondromalacia, which is a softening of the cartilage, but no evidence of meniscal or ligamentous injury, and the exam was

otherwise negative.  [T. 192].  Dr. Chadwick concluded that the MRI suggested "nothing of great significance," and that the Plaintiff's "symptoms seem greater than what his MRI would suggest."  [T. 166].  Dr. Chadwick administered an interarticular injection, but the Plaintiff's left knee was unresponsive.  Dr. Chadwick believed that the problem could be extraarticular.  Id.  A subsequent ultrasound of Plaintiff's right leg was negative.  [T. 190].

On October 6, 2003, the Plaintiff saw Dr. Harold L. Conley after he had complained of ankle, back, and knee pain.  [T. 119].  Upon examination of the Plaintiff's cervical and lumbar spine, there were no signs of neurological deficit.  [T. 210].  Dr. Conley concluded that the Plaintiff suffered from chronic low back pain and lower extremity pain without demonstrable cause.  Id.

On February 20, 2004, the Plaintiff was seen by Dr. Brook J. McIntyre, owing to complaints of back pain, in which he reported: "[S]ometimes it feels better and sometimes it feels worse."  [T. 207].  Dr. McIntyre noted that the Plaintiff weighed 242 pounds, and documented a decreased lumbar range of motion, normal cervical range of motion, and a negative straight leg raise test.  The Plaintiff was referred to a neck and back clinic, and was told to ice his back, rest, and take pain medications as necessary.  [T. 208].

The Plaintiff saw Dr. Charles E. Kelly on Dr. McIntyre's referral. [T. 218-23]. The Plaintiff reported that he was told to get out of bed slowly, and to exercise caution in lifting objects and bending his knees. [T. 219]. Dr. Kelly reviewed the MRI from February of 2003, and noted: "The imaging abnormalities * * * are often seen in patients with no symptoms whatsoever and therefore it is uncertain if they are related to his current complaints." [T. 221]. Dr. Kelly recommended a rehabilitation program lasting nine (9) to twelve (12) weeks, and noted that the "[p]rognosis for improvement in this patient is fair." [T. 222]. The recommendation also noted:

> He is significantly deconditioned and his symptoms are reflective of instability and poorer endurance. It is difficult to know if any of the MRI findings are the source of his symptoms. He is seeking a permanent disability which lowers his prognosis. There are also signs of symptom exaggeration. I have encouraged him to work hard, attend regularly and work in the muscles to true fatigue. If there [are] persistent signs of questionable effort and symptom exaggeration we will discontinue the program.

[T. 223].

At a follow-up visit, Dr. Kelly concluded that the Plaintiff had not reached maximum medical improvement, and reported that "his ability to do the functional activities, listed at the beginning of treatment as deficient, is improved." [T. 216]. At re-check, the Plaintiff's symptoms were unchanged and nonorganic signs continued to be

- 8 -

positive, and he was reminded of his need to work hard and attend regular programming. Dr. Kelly's prognosis remained guarded, and he also informed the Plaintiff that he was not aware of any other beneficial long-term treatments. [T. 217].

B.   <u>Hearing Testimony</u>.  The Hearing on April 29, 2004, commenced with some opening remarks from the ALJ. [T. 228-30].  The Plaintiff's attorney did not object to any of the evidence in the Record, and did not have any additional documents to add to the Record.  [T. 229].  The ALJ then began questioning the Plaintiff.  [T. 230].

The Plaintiff testified that he had graduated from high school, where he had received training in carpentry, but possessed no other vocational training.  [T. 231]. The ALJ noted the Plaintiff's alleged onset date of disability was November 1, 2000, but that the Plaintiff had worked subsequent to that date.  <u>Id.</u>  The Plaintiff stated that he was "not really" working at the time of the Hearing.  Upon further inquiry, the Plaintiff testified that he constructed a "little roof thing" for his mother's chimney, to prevent animal infestation, but that he had not received any compensation for his efforts.  [T. 231-32].

The ALJ addressed the Plaintiff's reported self-employment through 2002. The Plaintiff stated he did not recall working on any projects at home, but that he made

$4,800.00 on a four (4)- day contract job installing a window and a sliding glass door in September of 2002.  [T. 232-33].  He also had reported a three (3) day job in that same month in which he installed a piece of house siding, as well as a window.  [T. 233].  He stated "it was pretty hard," but that he was able to do it himself.  [T. 234]. He also stated that he installed gutters for a home during a six (6) hour workday.  Id.

The Plaintiff testified that he helped his brother on a part-time basis with a seven (7) to ten (10) day project, which involved cutting boards to construct a porch. [T. 234-35].  He testified that he had taken painkillers to help stay on his feet, but that he received no compensation.  [T. 235].  The ALJ asked the Plaintiff how he obtained his work in 2002, and the Plaintiff responded that he received all his work by word of mouth.  [T. 236].

The ALJ then questioned the Plaintiff as to the reason he could no longer work. The Plaintiff responded:

> Being on my feet.  You know, I can stay on my feet, but the more I'm on my feet, the more I have pressure on my spine. It's up in my upper back and it goes down all the way in to my legs and ankles, knees, and hips.  And it's like the more I'm on my feet, the longer I'm on them it feels like somebody's pushing down on my head or pushing it forward.  And it's, you know, it's causing me a lot of pain and there's times where I just, I have to sit down.  I've

noticed that if I keep my feet up and stay off my feet I don't
hurt as much.  I don't know if painkillers are the answer.
[T. 236-37].

The Plaintiff testified that he believed he could only stay on his feet for a half hour

prior to physical therapy, but that he could now force himself to stay up for two (2)

hours, and that walking was "absolutely" worse then simply standing in place. [T.

237].  He was able to sit in an electric recliner with a vibrator heater, but would

experience occasional pain, which he attributed to "degenerative discs." [T. 237-38].

The Plaintiff also experienced pain, on occasion,  if he suddenly turned, and lifted

objects with his right arm up to mid-chest height.  [T. 239].   He commented that

"sometimes it feels better, sometimes it don't," and surmised that his body "hurts a lot

with pressure changes."  Id.

        The Plaintiff testified he was right handed, but that he favored the left arm.  He

was able to drive with both hands on the steering wheel, and had not noticed any pain

when he would open a door.  He would also experience pain in his arm and lower

back when he utilized a bench press or a curling bar.  [T. 241].  At the time of the

Hearing, the Plaintiff was experiencing pain in his left ankle, which radiated into the

toes in his left foot.  His also felt discomfort in his right foot, which was exacerbated

by changes in the weather.  [T. 242].

- 11 -

When asked about medications, the Plaintiff stated that he had side effects with Ultracet, as it made him "feel high." [T. 242-43]. He was given arthritis pain medication, but the pain never really subsided. Vicodin took his pain away, but made him drowsy. Celebrex gave him "diarrhea so bad." [T. 243-44].

The Plaintiff lived alone, and was living off money he had saved for retirement, which had dwindled down to $1,000.00. The ALJ then inquired about the Plaintiff's abilities to perform chores. The Plaintiff stated he could vacuum his home in thick carpeted areas, but not on the hard surfaces. He tried to clean up the bathroom, by wiping the tub and sink off once in a while. [T. 245]. He was able to drive to the grocery store, and he either utilized an electric cart, or he would lean on a manual cart while walking through the store. [T. 246]. He was able to shovel his sidewalk after the last snowfall, while medicated with painkillers. [T. 246-47]. He could do his own simple cooking, and often utilized a George Foreman grill. [T. 247]. He could also launder his own clothes, and had to travel up a flight of stairs once or twice a day. [T. 248]. He also performed basic grooming activities. Id.

When asked why he could not perform a job where he sat for eight (8) hours a day, the Plaintiff said that the pain in the past was "really hard" on him, and the walk from his house to a job alone was difficult. Id. He testified that one doctor called him

"gimpy," and his physical therapist recommended that he constantly wear tennis shoes. [T. 249]. He stated that the pain from walking to a place of employment would last all day, if he did not utilize painkillers. The ALJ then allowed Plaintiff's counsel to make further inquiry.

The Plaintiff testified that his pain level fluctuated on a daily basis, and that his body felt like a broken down machine. [T. 250]. His typical daily routine consisted of preparing coffee and breakfast, reading the Bible, watching television, and going upstairs. He stated that "it just depends upon how I feel." If his body felt good, he liked to "get up and move around." If he felt bad, he would get in his recliner, "kick back," and watch television. Id. He would occasionally "get a pain from sitting too long." [T. 250-51]. His painful days were more frequent, since he began physical therapy.

He stated that he loved his prior job, and that similar activities were difficult, "especially by myself with planks [and] ladders." [T. 251]. He experienced occasional headaches, and had problems with his knees since embarking on physical therapy. [T. 252]. He testified he had a lot of pain in his right foot. The ALJ interrupted the Plaintiff's testimony to expedite the Hearing, noting that the Plaintiff already testified as to his problems with his feet and shoulder. Id.

The Plaintiff clarified that his earlier statement of making $4,800.00 was a gross receipt, and that he actually made only $1,200.00 after paying for window materials. He also noted that physical therapy had been helping as "it strengthened [his] back and I guess I don't notice the pain as much." [T. 253].

When asked by counsel if there was anything else the ALJ should be made aware of, the Plaintiff responded:

> When I fell * * * to the orthopedic that did the surgery on me, and when I went in there at the time I was involved in trying to recoup the money that I had paid for the operation and everything.  And he – the doctor told me, this is his words, take aspirin.  Aspirin does not work.  I have taken many aspirins, I've tried just about everything that there is out there.  I mean it seem like it started to work, but it's like after you get to using all of them, it's – there's no relief. What I found is I found that the painkillers are, and I know they're not good for you, but I don't know where to turn or what to do.

[T. 254].

At that point, the Plaintiff stated that his testimony had covered all of the material topics, and he was excused.

The Hearing continued with the testimony of the Medical Expert ("ME"), who confirmed that he was an impartial witness, and that he had reviewed all of the

- 14 -

available medical evidence.  [T. 255].  The Plaintiff's attorney had no objection to the

ME's qualifications.  Id.  The ME did not have any questions for the Plaintiff.

The ME then listed the Plaintiff's impairments.  Id.  The ME noted that he had

been treated for low back pain with right lower extremity radiation, and that the

Record indicated that the Plaintiff had degenerative disc disease at two levels and

osteoarthritic changes in the lumbar spine.  [T. 255-56].  The examinations had not

found any neurological loss, and an EMG of the Plaintiff's lower extremities was

normal.  [T. 256].  The Plaintiff's range of motion had not been severely impacted,

and neck pain complaints were attributable to strain.  The ME noted that the Record

indicated that there were findings of deconditioning, and that subjective complaints

dominated over the objective findings.  The record indicates reports of knee pain, but

there was little objective evidence of a cause, although mild chondromalacia was

noted.  Obesity was diagnosed, and the Plaintiff's complaints of ankle pain was likely

caused by some osteoarthritic changes after an ankle fracture, and pain in the right

ankle had been treated with orthotics.  Id.  The medical record did not document

shoulder pain.  The ME concluded that, absent some finding of significant loss of

range of motion, or neurological compromise, none of those impairments met or equaled the Listings,[1] either individually, or in combination.  [T. 257].

Based upon those impairments, the ME would restrict the Plaintiff to light work.  Id.  The ME also would place restrictions upon the Plaintiff in regard to lifting, or time spent on his feet.  The ME placed occasional limitations in the areas of bending, twisting, stooping, kneeling, and crawling upon the Plaintiff.  Id.  The ME also noted that the record did not support a shoulder condition.  The Plaintiff was also precluded from repetitive, but not occasional, ankle activity.

Next, the Plaintiff's counsel examined the ME, and questioned him about the difference in measurements of the Plaintiff's legs.  The ME stated that there was not enough of a difference to be clinically significant.  [T. 258].  Upon questioning by counsel, the ME felt that a chronic pain syndrome should be considered, but was not a diagnosis contained in the Record.  [T. 258-59].  The questioning of the ME then concluded.

---

[1]20 C.F.R. §404, Subpart P, Appendix 1, contains a Listing of Impairments that identifies a number of different medical conditions, and describes a required level of severity for each condition.  If the required severity is met, the claimant is found disabled without considering vocational factors.

The Hearing then continued with the testimony of the Vocational Expert ("VE"), who had reviewed the vocational evidence in the Plaintiff's file, and who was familiar with jobs in the State of Minnesota. [T. 259-61]. The Plaintiff's attorney had no objection to the VE's qualifications, and the VE had no questions for the Plaintiff. [T. 260].

The ALJ then posed a hypothetical to the VE, which asked him to assume a male with a high school education, who was forty-four (44) years of age, and who had past work experience as set forth in the VE's report. Id. The ALJ related that the individual was impaired primarily by the ailments disclosed by the ME, including a history of a left ankle fracture with possible ongoing osteoarthritic changes, some kind of Achilles tendonities or fascitis in the right foot, degenerative disc disease in the lumbar spine, possible knee pain secondary to mild chondromalacia, obesity, and neck strain.

The hypothetical person would be exertionally limited to light work, which involved lifting no more than twenty (20) pounds occasionally, and ten (10) pounds frequently, up to six (6) hours of walking and two (2) hours of sitting in an eight (8) hour work day. The available work was also limited to no more than occasional bending, twisting, stooping, kneeling, crouching, crawling, and climbing; and no more

- 17 -

than occasional repetitive activities of the ankles in either dorsal or plantar flexion. [T. 260].

With those limitations in mind, the VE testified that the individual would be unable to perform any of the past jobs which the Plaintiff had previously held.  [T. 261].  The ALJ then inquired into the availability of any other jobs in the national economy, which could be performed by the hypothetical individual.  Id.   The VE testified that there are such jobs in bench level production in assembly, as well as in unskilled assembly, hand trimming, polishing, and sanding.  Id.

The VE testified that the hypothetical individual would be well suited for work as a lock assembler, which used the transferrable skill of working with hand tools, or as an assembler of optical goods.  He testified that there were about 100,000 hand working jobs listed in the State Census in hand working.  The individual would also be suited for employment as an assembler -- a sedentary, unskilled position with 65,000 positions in the State Census.

The ALJ further limited the hypothetical by assuming the previous limitations, but added that the person would be exertionally limited to unskilled work by pain and possible side effects from medication.  With those limitations in mind, the VE testified the hypothetical person could still work in the previous optical goods assembly

- 18 -

positions, but the numbers would decrease. [T. 261-62].  One additional example of a suitable position was in plumbing assembly, as an atomizer, with an estimated 15,000 positions in Minnesota.  [T. 262].

The ALJ further restricted the hypothetical to assume a sedentary exertional level, which required foot elevation while the individual was seated, as well as a restriction on the time that he spent either walking or standing.  The VE testified that those restrictions would not problematic, but cautiously offered a one-third (1/3) reduction in the available positions in order to accommodate  a sit/stand option.  He further stated that foot elevation would not be a problem, and estimated that 10,000 such positions existed in the state, including the atomizer and optical goods jobs.  Id. The VE testified that requiring a wheelchair restriction would preclude many of the cited positions.  [T. 263].

The Plaintiff's attorney then questioned the VE as to the limitations involving foot elevation, and whether the height of the elevation reduced the number of available jobs.  [T. 263-64].  The VE responded that such a factor had been accounted for in the reduction of jobs based upon those express limitations.  At that point, the Hearing concluded with the ALJ stating her intention to issue a written decision.  [T. 264-65].

C.    <u>The ALJ's Decision</u>.  The ALJ issued her decision on August 11, 2004.

[T. 17-26].  As she was required to do, the ALJ applied the sequential, five-step

analytical process that is prescribed by 20 C.F.R. §404.1520.[2]  As a threshold matter,

the ALJ concluded that the Plaintiff had not engaged in substantial gainful activity,

since his alleged onset date.  [T. 18].

---

[2]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

<u>Simmons v. Massanari</u>, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  <u>Id.</u> at 754.

- 20 -

Next, the ALJ examined whether the Plaintiff was subject to any severe physical or mental impairments, which would substantially compromise his ability to engage in work activity. After considering the Plaintiff's medical history, which included the reports of the Plaintiff's treating physicians, the opinions of the Agency Physician consultants, and the testimony adduced at the Hearing, the ALJ found that the Plaintiff was severely impaired by obesity, Achilles tendonitis, plantar fasciitis in the right heel, degenerative changes in the lumbar spine, neck strain, left ankle fracture, and mild chondromalacia of the knees. [T. 18]. The ALJ noted the Record lacked evidence of a shoulder impairment, and found that any residual shoulder discomfort did not result in any more than a minimal limitation of the Plaintiff's ability to engage in work activities. [T. 19].

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations. See, 20 C.F.R. §§404.1520(d). The ALJ determined that the Plaintiff's physical and mental impairments did not meet, or equal, the criteria of any Listed Impairment, based on the testimony of the ME, and the Record as a whole. [T. 18-19].

The ALJ then proceeded to determine the Plaintiff's RFC. [T. 19]. The ALJ recognized that, in order to arrive at the Plaintiff's RFC, she was obligated to consider

all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and Title 20 C.F.R. §404.1529.   After considering the entire Record, including the testimony adduced at the Hearing; the opinions of the Plaintiff's treating physicians; the questionnaires proffered by the Plaintiff's family and friends; the impartial ME; the objective medical evidence; the State Agency consultants, and the Plaintiff's subjective complaints of pain, the ALJ determined the Plaintiff's RFC to be as follows:

> The [Plaintiff] retains the residual functional capacity to perform work at the light exertional range, which is defined as lifting 20 pounds occasionally and ten pounds frequently, standing/walking a total of six hours in an eight-hour day, and sitting a total of six hours in an eight-hour day.  (20 CFR 404.1567).  He is limited to no more than occasional bending, twisting, stooping, kneeling, crouching, crawling, or climbing, and no more than occasional repetitive ankle activities in dorsiflexion or plantar flexion.  Based upon the [Plaintiff]'s allegations of pain and in order to give him the benefit of reasonable doubt, the [Plaintiff] is restricted to unskilled work.

[T. 20].

The ALJ determined that such an RFC was consistent with the weight of the Record, but was inconsistent with the Plaintiff's assertion that he was disabled from all work activity by his impairments.  Id.

The ALJ also determined that the Plaintiff's subjective complaints of disabling pain were inconsistent with the Record.  Id.  The ALJ gave great weight to the ME, and some weight to the non-examining Agency consultants, and found the RFC was consistent with the objective medical evidence.  However, the ALJ found that the objective medical record did not support the Plaintiff's claims of disabling pain, and cited to the records of the Plaintiff's treating physicians.  [T. 20-22].

The ALJ found inconsistencies throughout the Record, which did not support the Plaintiff's credibility, noting that the ME testified that "the claimant's subjective complaints predominate over the objective findings in the record, and noted that there were references * * * to the claimant's deconditioning." [T. 22].  The ALJ also found the conservative nature of the Plaintiff's medical treatment, consisting of prescribed pain medication, physical therapy, chiropractic treatment, and rehabilitation, was inconsistent with claims of disabling pain.  [T. 23].  The ALJ noted that several pain medications were effective in reducing the severity of the Plaintiff's pain, such that he was able to shovel snow, and perform household chores.

The ALJ found the Plaintiff's daily activities were inconsistent with the level of pain he had described at the Hearing.  The Plaintiff was able to tend to his personal needs, operate a car, shovel snow, cook, do laundry, and shop -- all while living alone. He had also assisted others in carpentry projects.  The ALJ noted that the Plaintiff's work history supported his credibility, but found that the Plaintiff's complaints of pain were not totally believable.  Id.

Proceeding to the Fourth Step, the ALJ determined, based upon the VE's analysis, inclusive of the RFC which the ALJ had found, that the Plaintiff could not perform his past relevant work.  [T. 24].

Accordingly, the ALJ noted that the burden shifted to the Commissioner to establish the final step; namely, whether there were other jobs, existing in significant numbers in the national economy, that the Plaintiff could perform given his RFC, age, education, and work experience.  Id.  The ALJ noted that the Plaintiff was currently 44 years old, which is defined as a younger individual.  Id.; see also, Title 20 C.F.R. §§404.1563.  As related by the ALJ, considering the Plaintiff's age, education, past relevant work experience, and RFC, the VE had opined that the Plaintiff could perform work in assembly, such as an atomizer, of which there were 15,000 jobs in the regional economy which met the proposed hypothetical.  Id.  The VE also testified

that the Plaintiff would need to make only a minimal vocational adjustment, in order to perform those jobs. The ALJ noted that the VE had testified that, even if the Plaintiff were restricted to a sedentary exertional level and required leg elevation, he would be able to perform approximately 10,000 jobs within the assembly occupations. After taking into consideration the Plaintiff's age, educational background, and RFC, the ALJ concluded that the Plaintiff was not disabled, and therefore, that he was not entitled to a period of disability, or DIB. [T. 24].

## IV.  Discussion

A.    Standard of Review.  The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra

at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed. See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998). On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied. See, Loving v. Secretary of Health and Human Services, 16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001). Stated otherwise, "[s]ubstantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence supports the decision." Banks v. Massanari, 258 F.3d 820, 822 (8th Cir. 2001). Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'" Vandenboom v. Barnhart, 412 F.3d 924, 927

- 26 -

(8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004);

Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82

F.3d 259, 262 (8th Cir. 1996).   Under this standard, we do not reverse the

Commissioner even if this Court, sitting as the finder-of-fact, would have reached a

contrary result.  See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v.

Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of

drawing two inconsistent conclusions, and therefore, embodies a "zone of choice,"

within which the Commissioner may decide to grant or deny benefits without being

subject to reversal on appeal.  See, Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir.

1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as

there is substantial evidence in the record to support the Commissioner's decision, we

will not reverse it simply because substantial evidence exists in the record that would

have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.

1995), or 'because we would have decided the case differently.'"), quoting Holley v.

Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001).  Our review of the ALJ's factual

determinations, therefore, is deferential, and we neither reweigh the evidence, nor

review the factual record de novo.  See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445

(8th Cir. 2004); <u>Flynn v. Chater</u>, 107 F.3d 617, 620 (8th Cir. 1997); <u>Roe v. Chater</u>, 92

F.3d 672, 675 (8th Cir. 1996).

      B.   <u>Legal Analysis</u>. In support of his Motion for Summary Judgment, the

Plaintiff advances the following arguments:

> 1.   The ALJ's Assessment of Functional Limitations was Unsupported by Substantial Evidence.
>
> 2.   The ALJ Improperly Discounted the Credibility of the Plaintiff.

We address each contention in turn.

> 1.   <u>The Plaintiff's Contention that the ALJ's Assessment of Functional Limitations was Unsupported by Substantial Evidence</u>.

      The Plaintiff maintains that the ALJ's findings, concerning his

RFC were not supported by substantial evidence.  The Plaintiff argues that the ALJ

was obligated to consider all of a claimant's impairments, and argues that the Plaintiff

suffers from the following ailments:  a left ankle fracture with possible osteoarthritic

changes; possible Achilles tendonitis or fasciitis in the right heel; degenerative

changes in the lumbar spine; neck strain; chondromalasia of the knee; and obesity.

<u>Plaintiff's Memorandum in Support of Summary Judgment</u>, <u>Docket No. 25</u>, at pp. 18-

19.  However, in arriving at the RFC, the ALJ specifically accounted for all of the

aforementioned ailments, and considered them severe:

> In order to assist in the evaluation of this complicated
> record, the undersigned requested the testimony of an
> impartial medical expert, Andrew M. Steiner, M.D., a board
> certified physical medicine and rehabilitation physican.
> [citation omitted].   Dr. Steiner testified that the record
> documented treatment for neck, knee, leg, ankle, and low
> back pain.   He testified that the claimant's ankle pain
> related to a fracture of the left ankle he sustained in 1997
> after he fell off a ladder.  The record contains diagnoses of
> obesity, Achilles tendonitis, plantar fasciitis in the right
> heel, degenerative changes in the lumbar spine, neck strain,
> left ankle fracture and mild chondromalacia of the knees.

> \*       \*       \*

> The [adopted] residual functional capacity is based upon
> the testimony of the impartial medical expert, Dr. Steiner,
> a board certified physical medicine and rehabilitation
> physican.  The undersigned has considered Dr. Steiner's
> testimony and gives it great weight based upon his medical
> experience and expertise, and the opportunity he had to
> review the medical file and personally observe the claimant
> at the hearing.

> The above residual functional capacity is supported by the
> opinion of the medical consultants with the Minnesota
> Disability Determination Services, who found the claimant
> capable of a modified range of light work. [citation
> omitted] As non-examining physicians, their opinions are
> not entitled to controlling weight, but are considered and
> weighed as that of highly qualified physicians who are

experts in the evaluation of the medical issues in disability
claims under the Social Security Act.  [citation omitted].

The objective medical evidence is fully consistent with the
above residual functional capacity and inconsistent with
disabling levels of pain.

[T. 20-21].

We find that the ALJ thoroughly reviewed the Record, and  properly considered the

opinions of the Plaintiff's treating physicians, and adopted all of their findings.  We

further find that the RFC, as determined by the ALJ, was supported by the

determinations of all of the State Agency physicians.   Moreover, the Plaintiff's

treating medical sources did not set any limitations, or restrictions, upon the Plaintiff

that were dismissed by the ALJ, and the Plaintiff has offered none.  See, Hensley v.

Barnhart, 352 F.3d 353, 357 (8th Cir. 2003)("Finally, no functional restrictions were

placed on [the plaintiff's] activities, a fact that we have previously noted is

inconsistent with a claim of disability."), citing Melton v. Apfel, 181 F.3d 939, 941

(8th Cir.1999); Smith v. Shalala, 987 F.2d at 1371, 1374-75 (8th Cir. 1993).

As the ALJ noted, the physicians provided specific reasons to support their

opinions.  In the absence of any contradictory or conflicting evidence, by any treating

medical sources, the ALJ is entitled to rely on the opinions of the State Agency

physicians as substantial evidence.  See, Jones ex rel. Morris v. Barnhart, 315 F.3d

974, 978 (8th Cir. 2003)("The determination by a physician from such a state agency is to be treated by an ALJ as 'expert opinion evidence' and given 'appropriate weight.'"), quoting <u>SSR 96-6p</u>, 1996 WL 374180 (July 2, 1996); see also, <u>Meares v. Barnhart</u>, 2003 WL 22293913 at *11 (E.D. Mo., August 29, 2003)(where "there was no examining source who opined as to plaintiff's lifting capacities," "'[i]t was well within [the ALJ's] authority to rely * * * on the RFC provided by the agency consultant.'"), quoting <u>Melton v. Barnhart</u>, 2003 WL 21976088 at *4 (S.D. Iowa, August 4, 2003), and citing <u>20 C.F.R. §404.1527(f) (2)(i)</u>.

While the Plaintiff contends that the mere existence of his conditions, which the ALJ found were severe, undermines the ALJ's RFC, we conclude to the contrary. The RFC, which was determined by the ALJ, finds substantial, if not conclusive, support in the Record when considered as a whole, and therefore, we find that the ALJ's RFC determination was supported by substantial evidence.

2.    <u>The Plaintiff's Assertion that the ALJ Improperly Discredited his Testimony</u>.

a.    <u>Standard of Review</u>.  The governing law makes clear that credibility determinations are initially within the province of the ALJ.  <u>Driggins v. Bowen</u>, 791 F.2d 121, 125 n. 2 (8th Cir. 1986); <u>Underwood v. Bowen</u>, 807 F.2d 141,

- 31 -

143 (8th Cir. 1986).  As a finding of fact, the determination must be supported by substantial evidence on the Record as a whole.  See, Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).

To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the Record which led to the rejection of the specific testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony. See, Shelton v. Chater, 87 F.3d 992, 995 (8th Cir. 1996); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Ricketts v. Secretary of Health and Human Services, 902 F.2d 661, 664 (8th Cir. 1990).  These requirements are not mere suggestions, but are mandates that impose affirmative duties upon the ALJ.  Johnson v. Secretary of Health and Human Services, 872 F.2d 810, 814 n. 3 (8th Cir. 1989).

The mode and method by which an ALJ must make and support a credibility finding, on the basis of subjective symptoms, has been firmly established in the Eighth Circuit by Polaski v. Heckler, supra, and its progeny.  See, e.g., Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996); Shelton v. Chater, supra; Jones v. Chater, 86 F.3d 823 (8th Cir. 1996).  Factors which the ALJ must consider, in the evaluation of the

Plaintiff's subjective symptoms, include the Plaintiff's prior work record and the observations of third parties, and of physicians, concerning:

1.    the claimant's daily activities;

2.    the duration, frequency, and intensity of the pain;

3.    precipitating and aggravating factors;

4.    dosage, effectiveness and side effects of medication; and

5.    functional restrictions.

Polaski v. Heckler, supra at 1321-22.

The ALJ must not only consider these factors, but he must list them and explain the resolution of any demonstrable conflict or inconsistency in the Record as a whole. Cf., Jones v. Chater, supra at 826; Delrosa v. Sullivan, 922 F.2d 480 (8th Cir. 1991); Carlock v. Sullivan, 902 F.2d 1341 (8th Cir. 1990).

It is well-settled that an ALJ may not disregard a claimant's subjective complaints of pain, or other subjective symptoms, solely because there is no objective medical evidence to support them. Ostronski v. Chater, supra at 418; Jones v. Chater, supra at 826; but cf., Johnston v. Shalala, 42 F.3d 448, 451 (8th Cir. 1995)(ALJ should consider absence of objective medical basis as a factor to discount the severity of a

- 33 -

claimant's subjective complaints of pain).  It is also firmly established that the physiological, functional, and psychological consequences of illness, and of injury, may vary from individual to individual.  Simonson v. Schweiker, 699 F.2d 426 (8th Cir. 1983).  For example, a "back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition, due to * * * general physical well-being is generally deteriorated." O'Leary v. Schweiker, 710 F.2d 1334, 1342 (8th Cir. 1983); see also, Landess v. Weinberger, 490 F.2d 1187 (8th Cir. 1974). Given this variability, an ALJ may discredit subjective complaints of pain only if those complaints are inconsistent with the Record as a whole.  Taylor v. Chater, 118 F.3d 1274, 1277 (8th Cir. 1997); Johnson v. Chater, supra at 944.

Nevertheless, as the decisions of this Circuit make clear, the interplay of the Polaski factors in any given Record, which could justify an ALJ's credibility determination with respect to a Plaintiff's subjective allegations of debilitating symptoms, is multi-varied.  For example, an individual's failure to seek aggressive medical care militates against a finding that his symptoms are disabling.  Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988).  By the same

- 34 -

token, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility." Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); see also, Lawrence v. Chater, 107 F.3d 674, 676-77 (8th Cir. 1997)(ALJ may discredit complaints that are inconsistent with daily activities); Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996); Shannon v. Chater, supra at 487.  Among the daily activities, which counterindicate disabling pain, are:  a practice of regularly cleaning one's house, Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997); Chamberlain v. Shalala, supra at 1494; cooking, id.; and grocery shopping, Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996).  Although daily activities, standing alone, do not disprove the existence of a disability, they are an important factor to consider in the evaluation of subjective complaints of pain.  Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).

       b.    Legal Analysis.  In arriving at his RFC, the ALJ found that the Plaintiff's subjective complaints of pain were not entirely credible, and she discredited the testimony of the Plaintiff, insofar as his complaints were inconsistent with the Record as a whole.  Guided by Polaski v. Heckler, and its progeny, the ALJ found the credibility of the Plaintiff, as to the severity of his impairments, was undermined by his medical records and reported daily activities.  She also found

- 35 -

evidence in the Record that supported the Plaintiff's claims of a "strong work ethic," and considered that finding in her credibility analysis, as well as the questionnaires completed by the various acquaintances of the Plaintiff.  [T. 20-21, 23].

In discounting the Plaintiff's testimony, the ALJ referenced  medical evidence that related to the Plaintiff's complaints.   Specifically, the ALJ found that the Plaintiff's credibility was undermined by observations made by his treating physicians, which found his complaints of pain were out of proportion to the objective medical evidence.  [T. 22, 144, 166, 210, 217, and 223].  The ALJ also noted that the Plaintiff only sought conservative treatment -- prescribed pain medications, physical therapy, and rehabilitation -- and did not seek more aggressive treatments, such as surgery or biofeedback.   [T. 23].   After  considering the objective evidence, the opinions of the physicians, the lack of significant treatment, as well as the opinion of the ME, the ALJ determined that a light exertional restriction would accommodate the Plaintiff's severe impairments, as well as his need to elevate his feet or avoid standing or walking for extended periods of time.  [T. 19-20].  The ALJ found that any greater limitation on the RFC would be unsupported in the Record as a whole.  Furthermore, the ALJ noted that the Plaintiff's claims of total disability, ostensibly based on his

pain, were inconsistent with the Record, as his pain level appeared to adequately respond to prescribed pain medications and improved with physical therapy. [T. 23].

The ALJ also found that the Plaintiff's daily activities, as corroborated by the questionnaires, were inconsistent with the degree of impairment that he had asserted. While the Plaintiff contends that the ALJ failed to fully consider the questionnaires, we wholly disagree with that assertion. The ALJ cited the questionnaires, and considered them in arriving at the Plaintiff's RFC, and found that they corroborate some level of pain, but not the incapacitating pain that the Plaintiff alleges. [T. 19]. The Plaintiff also contends that the work history was not properly considered by the ALJ, but again, we find that the ALJ considered that in the credibility analysis and found that, "the claimant's work history supports his credibility to the extent indicated above." [T. 23].

The ALJ relied on the Plaintiff's own testimony, which supported his capacity to attend to his personal needs; drive a car; shovel snow; read books; watch TV; perform his own shopping, cooking, and laundry; and assist his brother with carpentry projects in 2003 -- after the alleged onset date. Such daily activities demonstrated that the Plaintiff was able to function at a level which was accommodated by the ALJ's RFC.

"The ALJ is in the best position to gauge the credibility of testimony and is granted deference," <u>Sarna v. Barnhart</u>, 32 Fed.Appx. 788, 791 (8th Cir. 2002), and "[w]e will defer to the ALJ's findings," where, as here, "they are sufficiently substantiated by the record."  <u>Ramirez v. Barnhart</u>, 292 F.3d 576, 581 (8th Cir. 2002); see also, <u>Estes v. Barnhart</u>, supra at 724, citing <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).  We find no basis to reverse the Plaintiff's credibility rulings, and we reject that challenge to the ALJ's determination.

NOW, THEREFORE, It is –

RECOMMENDED:

1.     That the Plaintiff's Motion [Docket No. 24] for Summary Judgment be denied.

2.     That the Defendant's Motion [Docket No. 27] for Summary Judgment be granted.

Dated:  August 1, 2006                    _s/Raymond L. Erickson_
                                           Raymond L. Erickson
                                           CHIEF U.S.  MAGISTRATE JUDGE

- 38 -

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **August 18, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **August 18, 2006**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.